FILED

FEB 2 3 2009

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

# FOR PUBLICATION

ENTERED

FEB 2 3 2009

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 8:07-12462-TA |
| LEE STERN AND JACQUELINE STERN, | Chapter 7 |
| Debtor. | Adv. No. 8:07-01386-TA |
| | Adv. No. 8:07-01387-TA |
| NATIONAL GOLD EXCHANGE, INC. | **STATEMENT OF DECISION AFTER TRIAL** |
| Plaintiff, | Date: February 17, 2009 |
| vs. | Time: 10:00 a.m. |
| LEE STERN | Place: 5B |
| Defendant. | |
| GAINESVILLE COIN, INC. | |
| Plaintiff, | |
| vs. | |
| LEE STERN | |
| Defendant. | |

1    This case requires the Court to determine whether the obligations owed by the

2    debtor/defendant to plaintiffs for certain rare coins delivered into his custody, but never

3    paid for, are non-dischargeable as provided in 11 U.S.C. §§ 523(a)(4) or (a)(6).  The

4    Court will also address certain alternative theories such as actual fraud under 11 U.S.C.

5    § 523(a)(2)(A) which, although not raised in the complaint, were obliquely raised in

6    argument at trial. This case requires an evaluation of what constitutes "willful and

7    malicious" injury in the commercial context under current Ninth Circuit standards.  This

8    case also requires the Court to explore the arcane practices of rare coin dealers who

9    sometimes sell or deliver product between themselves "on memo," as that concept may

10   affect whether the relationship between these parties became "fiduciary" in nature

11   within the meaning of 11 U.S.C. § 523(a)(4).

12

13    An order was entered October 14, 2008 adopting the Joint Pre-Trial Stipulation

14   of the parties, which narrowed the issues for trial.  A trial on these consolidated actions

15   was held February 17, 2009.  All proffered Exhibits were entered into evidence at trial,

16   those being Exhibits "1" through "12" for the plaintiffs and "A" through "E" for the

17   debtor/defendant.  There was objection to the purported second pages of Exhibits "3"

18   and "4" (invoices) as defendant denied receiving these which apparently contained

19   terms and conditions, but these were nevertheless received into evidence over

20   objection that no proper foundation had been laid. Direct testimony from the witnesses

21   was received by declaration, while cross examination and re-direct were heard live at

22   trial.  The Court has carefully considered the trial briefs of the parties, the testimony and

23   the exhibits.  The Court took the matter under submission after trial and renders now its

24   Statement of Decision containing its findings of fact and conclusions of law as required

25   under FED. R. BANKR. P. 7052.

26

1    The facts, with a few notable exceptions, are not substantially in dispute.

2

3    **A. Findings of Fact**

4    Plaintiffs are professional dealers of long standing in, among other things, rare

5    coins.  Their stores are located in Florida but plaintiffs advertise to the trade nationwide.

6    Defendant/debtor Lee Stern ("debtor"), a California resident, has been in the rare coin

7    business since about 1990; he is what is commonly referred to as a "vest pocket dealer"

8    in that he maintains no retail store but keeps a limited inventory in his home.  Debtor did

9    business under the trade name "Rare Coins & Gold."  He trades with other dealers and

10   over the internet, and occasionally will make a retail sale to collectors.  Debtor had been

11   a customer of plaintiff National Gold Exchange, Inc. ("NGE") for about 10-15 years.

12   Most of his transactions were through an NGE salesman, Tom Paine, who has worked

13   for NGE since the early 1990s.  Until the transactions at issue in this case in late 2006,

14   all transactions were previously concluded satisfactorily and without apparent incident.

15   The evidence is unclear as to how long debtor/defendant may have been a customer of

16   University Coins, now known as Gainesville Coins ("GC"); however, there is a familial

17   connection in that the owners of GC are also the nephews of the owners of NGE.

18   Debtor's troubles apparently began when he was contacted by "cold call" in late

19   2004 by one Bruce Fox. Mr. Fox reportedly inquired about the possibility of doing

20   business with the debtor in the procurement and purchase of rare coins.  The debtor

21   met Fox on or about October 7, 2004 and was told that Fox had a number of wealthy

22   retail clients in southern California who were interested in acquiring certain categories

23   of rare coins.  Apparently, Fox enjoyed some degree of credibility by virtue of having

24   authored an acclaimed book on "Walking Liberty" half dollars.  Debtor began doing

25

26

- 3 -

business with Fox on small trades which, in the early years, were apparently concluded satisfactorily.  These included coins placed with Fox "on memo," which meant (at least to the debtor's understanding) that possession could be delivered to the inquiring dealer with the expectation that he would, in turn, show it to a customer in order to determine whether a sale can be made.

Mr. Mark Feld, debtor's expert witness, testified that it is common among rare coin dealers to deliver possession of selected coins without advance payment to a fellow dealer in order to facilitate the second dealer's ability to show the coin(s) to a third party, who might be another dealer or perhaps a consumer.  Many customers have "want lists" on file with dealers specifying select coins needed for a collection.  Thus dealers are always searching for a source to fill their customer's "want list."  It is usual that dealer B will not reveal the identity of his customer to dealer A as this is valuable proprietary information.  Instead of a consumer, sometimes there will be any number of intermediary dealers C, D and so on in the effort to make ultimately a match between buyer and seller.  It is expected that possession of merchandise between dealers will be allowed for some weeks or even months before either return of the coin(s) or payment is expected by dealer A or by intervening dealers in the chain.  Presumably, if a sale is made then proceeds will be remitted by the buyer and then by each dealer in the chain in reverse order, less a profit, until the original price is remitted ultimately to dealer A.  If the sale is not made then the coin(s) are returned in like fashion.  The transaction generally described above is referred to as a sale "on memo."  As Mr. Feld admitted, there can be variants to "on memo" transactions and each dealer is free to impose his

own unique terms.[1]  For example, plaintiffs contend that their terms were that debtor could only show the coins to customers but not release possession until payment was remitted to plaintiffs.  "On memo" transactions facilitate trade in rare coins as intervening dealers in the chain are not obligated to place their own money at risk in the effort to find an end buyer, and dealers are able to keep their customers' identity secret. What such transactions all share, of course, is a high degree of trust between dealers that eventually either the coin will be returned or the price paid.

In some cases coins delivered "on memo" would be returned unsold by Fox to debtor without incident.  Debtor testified that by late 2005 Fox began running an open account with debtor in that he did not necessarily pay for each coin by separate check, but instead would pay more occasionally against a balance that might represent the price of several coins.  A few of these checks tendered by Fox were returned for insufficient funds.  At first, Fox would make the checks good, often accompanied by excuses based on ill health or other reasons.  In June 2006, however, debtor began requiring Fox to make direct deposits in lieu of checks on new purchases.  This approach did not necessarily improve the overall situation in that it became even more difficult for debtor to correlate payments against any particular outstanding coin sale. Moreover, Fox began obtaining progressively more valuable coins from the debtor and debtor admits that he was providing the inventory faster than Fox was paying, causing cash flow problems.  Further, Fox began asking for an even longer time to sell "memoed" coins with a variety of what debtor at the time thought were plausible excuses. Debtor acquiesced because he believed Fox based on his track record, and

---

[1]  For this reason the Court does not make findings as to "trade usage" which might help interpret the agreement of the parties.  Ca. Com. Code § 1303(a)(2)(c).

1  because debtor was trying to expand his business. In retrospect, debtor admits that he

2  was being "set up" by Fox.

3       Debtor's belief, however naïve in retrospect, was not totally without grounds.

4  During the critical periods in or before November 2006, Fox did return at least five

5  valuable coins which had been out "on memo" from debtor for an extended period, in

6  addition to at least one which had in turn been obtained by debtor "on memo" from

7  NGE, a $6100 1852D gold Liberty.

8       The subject transactions are represented by Exhibits "1" through "7" and "12"

9  dated between September 22, 2006 and December 12, 2006. The invoices describe in

10  aggregate 21 rare coins with a range in individual price value between $1,265 and

11  $220,000. In each case the respective plaintiff shipped one or more rare coins to

12  debtor by certified or registered mail upon defendant's order at or near the dates of the

13  respective invoices. Each was admittedly an "on memo" transaction between dealers,

14  although this characterization does not explicitly appear in any of the writings. In each

15  case the respective invoice was included in the box or carton containing the coin(s) but

16  no other document or agreement between the parties appears in the evidence. There

17  was a conflict in the evidence as to the GC invoices, Exhibits "3" and "4," concerning

18  whether the second page of each invoice, containing terms and conditions of the sale,

19  were including in the mailings. Mr. Corey Maita testified that it was he who made the

20  sales to debtor and that it was GC's policy to print these terms on the reverse side of all

21  GC invoices, although he could not remember specifically if he was the one who

22  actually printed or placed the subject invoices into the boxes with the coins. Debtor

23  denied receiving these printed terms with the mailing of the GC coins; indeed, debtor

24  produced exhibits "D" and "E" which appear to be the originals of Exhibits "3" and "4",

- 6 -

respectively, but no printing appears on their reverse sides, which are blank.

Accordingly, the Court finds that the printed terms as appear on the purported reverse

sides of Exhibits "3" and "4" were not included with the mailings to debtor. With the one

exception described below, if any additional terms were imposed orally over the

telephone as part of these transactions, this does not appear in the evidence. With

respect to the 1921 MS63 $20 gold piece, a particularly expensive item at $220,000

[Exhibit "6"], Mr. Mark Yaffe, an owner and officer of NGE, testified that he was

consulted about this transaction by his salesman, Mr. Paine, apparently in the middle of

the debtor's telephone order. Mr. Yaffe testified he overheard Mr. Paine on the

telephone telling debtor to the effect that this coin was not to leave debtor's possession

absent payment to NGE. Debtor denies that any such restriction was ever

communicated to him. Significantly, no testimony was offered from Mr. Paine, although

he apparently is still in the employ of NGE. Accordingly, the Court finds that no such

oral terms were included in the transaction.

On each of the NGE invoices, Exhibits "5" through "7," there appears fine print at

the bottom which reads, in pertinent part: "Buyer shall not sell, pledge or otherwise

dispose of merchandise until paid for in full…" Below this appears a block for signature

and dating, presumably by the receiving customer. Similar language appears on the

alleged reverse of the GC invoices, Exhibits "3" and "4," i.e. "Buyer hereby agrees that it

shall at no circumstance sell, pledge or otherwise dispose of any merchandise

indentified on the reverse hereto unless the same is paid for in full…" The signature

blocks on both the NGE and GC invoices are, in any event, unsigned. If any previous

invoice sent by NGE or GC to debtor over the 10 or more years of their relationship was

ever signed, this does not appear in the evidence. No similar language appears at all

on the University Coin invoices, Exhibits "1" and "2." The value of the subject coins delivered on memo as described was in aggregate $404,125.

Debtor, upon receipt of each of the subject coins, transferred possession to Fox "on memo" with the expectation that Fox would sell them to one or more of Fox's alleged customers. If any invoice or written agreement existed between Fox and the debtor, it was not produced in evidence. Of course, as the reader by now expects, Fox neither paid for nor returned any of the subject coins. Indeed, apparently Fox neither paid for nor returned a substantial portion of debtor's own inventory which had been placed with him "on memo" as well, leaving debtor in a desperate financial predicament. Debtor tendered his own checks in the sum of $15,000 dated 12/21/06 and $3800 dated 12/26/06 to NGE in partial payment for the subject invoices but these were returned for insufficient funds [Exhibit "8"]. During this same period apparently Fox tendered insufficient fund checks to debtor as well, although if there was a direct "cause and effect" between Fox's NSF checks and the debtor's, that connection was not explained in the evidence. There was apparently a continuing exchange of e-mails between the debtor and Fox until as late as December 28, 2006, and even some partial payments from Fox into January 2007. Fox, at some point shortly thereafter, absconded and left debtor without either the coins or the money to face the increasingly angry demands of creditors, including plaintiffs.

Eventually, with the assistance of the FBI and other police agencies, NGE tracked down some of the coins to Mississippi where they were in the possession of one Jack Lee, who purportedly held them as a pledge against a loan made by him to Fox. NGE's litigation against Lee was settled on terms that involved a return of one or more of the subject coins and others as well, but on terms that resulted in substantial

- 8 -

1  damage to NGE.  The details of the accounting were not provided in the evidence but

2  Mr. Yaffe testified that NGE paid out in settlement as much again as the subject invoice

3  amounts to obtain recovery of its own coins.  Apparently, GC was unable to recover any

4  of its merchandise.  Debtor's Chapter 7 bankruptcy was filed August 10, 2007 and

5  these adversary proceedings were timely commenced November 8, 2007.

### B. Conclusions of Law

#### 1. 11 U.S.C. § 523(a)(4): Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement or Larceny

Plaintiffs proceed under 11 U.S.C. § 523(a)(4) which excepts from discharge

debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or

larceny."  However, plaintiffs never explain how it is that debtor was acting in a

"fiduciary capacity" in these transactions.  It is important to note that the fiduciary

capacity spoken of in § 523(a)(4) applies only to technical or express trusts, not trusts

*ex maleficio* that may be imposed as a legal remedy for the very act of wrongdoing out

of which the contested debt arose.  *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th

Cir. 1987); *Windsor v. Librandi (In re Librandi)*, 183 B.R. 379, 382 (Bankr. M.D. Pa.

1995).  Therefore, resulting or constructive trusts do not create the requisite fiduciary

relationship. *Short,* 818 F.2d at 695.   In order for the debt to be actionable for non-

dischargeability, the debtor must have been a trustee before the alleged wrong and

without reference thereto; the debtor must have already been a trustee before the debt

was created.  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S. Ct. 151, 153-54

(1934).

For purposes of § 523(a)(4) the definition of "fiduciary" is narrowly construed. Although the definition of "fiduciary" for purposes of § 523(a)(4) is a question of federal law, the court looks to state law, including statutes, for guidance on what circumstances create an express trust. *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986); *Angelle v. Reed (Matter of Angelle)*, 610 F.2d 1335 (5th Cir. 1980); *Rhode Island Lottery Comm. v. Cairone (In re Cairone)*, 12 B.R. 60 (Bankr. R.I. 1981). The applicable state law that creates the fiduciary relationship must clearly outline the duties and identify the separate and identifiable trust property.  *Nahman v. Jacks (In re Jacks)*, 243 B.R. 385, 393 (Bankr. C.D. Cal. 1999); *Cadlerock v. Becas (In re Becas)*, No. 06-11069-A-7, 2007 WL 1592070 at *3 (Bankr. E.D. Cal. May 31, 2007); 4 *Collier on Bankruptcy* ¶ 523.10(1)(d) (15th Ed. Rev. 2007).  A broad definition of "fiduciary" is inapplicable in the dischargeability context.  *Evans v. Pollard (In re Evans)*, 161 B.R. 474, 477 (9th Cir. BAP 1993).  Thus, ordinary commercial relationships, even ones that may involve elements of trust and confidence, are outside the reach of § 523(a)(4).  *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 983-84 (Bankr. N.D. Ind. 1988).  For example, where a debtor general contractor diverts funds from a certain construction project in favor of others, this did not necessarily make him a "fiduciary" for purposes of § 523(a)(4). *Lumbermens Mutual Casualty Co. v. Snellgrove (In re Snellgrove)*, 15 B.R. 149, 150 (Bankr. S.D. Fla. 1981).  Nor as to her surety did a debtor's responsibility to remit hunting license proceeds to the state make her a fiduciary. *Auto Owners Ins. Co. v. Littell (In re Littell)*, 109 B.R. 874, 880-81 (Bankr. N.D. Ind. 1989).  Neither a floor plan financing relationship between debtor and creditor nor an insurance agent's indebtedness for premiums paid created a trust relationship of the kind mentioned in § 523(a)(4). *Ford Motor Credit Co. v. Talcott (In re Talcott)*, 29 B.R. 874 (Bankr. D. Kan.

1983); *Great American Ins. Co. v. Storms (Matter of Storms)*, 28 B.R. 761 (Bankr. E.D. N.C. 1983); *In re Turner*, No. 01-11301, 2003 WL 23838108, at *8 (Bankr. D. Kan. May 30, 2003). Similarly, without more specific requirements, the status of bailee or partner does not create a fiduciary relationship within the meaning of § 523(a)(4). *Moore v. Holman (In re Holman)*, 42 B.R. 848, 851 (Bankr. E.D. Mo. 1984); *Huhman v. Braudis (In re Braudis)*, 86 B.R. 1001, 1004 (Bankr. W.D. Mo. 1988).

When the Court interprets state statutes to determine whether the requisite fiduciary relationship is created, certain elements are pivotal. Is the purported fiduciary required to maintain a segregated account? *Matter of Angelle*, 610 F.2d at 1340; *Murphy & Robinson Investment Co. v. Cross (Matter of Cross)*, 666 F.2d 873, 881 (5th Cir. 1982). Does the statute create the basic elements of a trust, including the definition of a *res* and are the fiduciary's duties spelled out? *Nahman*, 243 B.R. at 393; *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 759 (9th Cir. 1981). No statute has been cited to the Court which might bear upon whether a fiduciary relationship was created in the circumstances of this case; indeed, both sides acknowledge that the industry is entirely unregulated. More importantly, the pivotal elements (i.e. requirement of a separate account, definition of duties, etc.) appear entirely lacking.

While it is clear that a real estate agent, attorney, joint venturer, or a partner[2], is a fiduciary under circumstances involving their principal's or partnership's property within the meaning of 11 U.S.C. § 523(a)(4), it is far less clear whether coin dealers are "fiduciaries" with respect to each other. NGE argues that the fine print appearing at the

---

[2] *See e.g. Ragsdale v. Haller*, 780 F. 2d 794, 796 (9th Cir. 1986) [partners in California are fiduciaries]; *Lewis v. Short (In re Short)*, 818 F.2d at 696 [joint venturer is a fiduciary]; *In re Banks*, 225 B.R.738 (Bankr. C.D. Cal. 1998) *aff'd* 263 F. 3d 862 [attorney's knowing failure to remit proceeds of judgment a breach of fiduciary duty]; *In re Bugna*, 33 F. 3d 1054, 1057 (9th Cir 1994) [real estate broker a fiduciary].

1  bottom of the NGE invoices, which purports to require that the debtor not transfer or

2  "dispose of" the coins until paid for, created an express trust or fiduciary relationship.

3  However, there is no convincing evidence that this "boilerplate" was ever agreed to by

4  debtor, or was even taken seriously by NGE in the ten+ years of the parties'

5  relationship.  While it is true, certainly, that NGE was free to impose its own unique

6  terms as a condition of sale different from what might be "industry standard" concerning

7  "on memo" transactions, testified to by industry expert Mark Feld, there is no persuasive

8  evidence that these unique terms were made known to debtor as part of the subject

9  transactions.  The very fact that a signature line appears at the bottom of the invoices,

10  *which remained unsigned* although the goods were shipped, strongly suggests that

11  these terms were "after the fact" or apart from the "real terms."  Rather, the Court is

12  persuaded that "on memo" transactions implied that the debtor would possibly, or even

13  likely, be forwarding the coin for inspection to parties unknown, and thus loss of

14  possession before payment became an inherent risk in the transaction.

15

16         But even if these terms were included, the Court is not convinced that such

17  language is sufficient to have made a "fiduciary" out of the debtor.  Mere contract jargon

18  does not necessarily create a "fiduciary" relationship, even though the word "trust" may

19  be used[3]; rather, it is the substance and character of the debt relationship and not its

20  form that determines whether a fiduciary relationship exists.  See *Ford Motor Credit Co.*

21  *v. Gallaudet (In re Gallaudet)*, 46 B.R. 918, 925 (Bankr. D. Vt. 1985); *In re Littell*, 109

22  B.R. at 880.  Language similar to that used in this case has been held not to create the

23  requisite "fiduciary" relationship.  *Becas*, 2007 WL 1592070 at *2 [language that debtor

24

25  _____

26  [3]  In our case there is not even a reference to the word "trust" and so any inference of a
fiduciary relationship is even more strained.

1    would not "attempt to sell ...or otherwise dispose of" the finance company's collateral

2    was held not to create the requisite fiduciary relationship]; *Bryant v. Kinyon*, 127 Mich.

3    152, 86 N.W. 531 (Mich. 1901) [language that title would not pass until all of the

4    consideration was paid for product delivered not sufficient to create a "fiduciary debt"

5    within former section].  In sum, the Court sees no meaningful difference between debtor

6    and any customer who receives trade credit, sells his supplier's merchandise before

7    paying for it, and then files a bankruptcy petition.[4]  This happens to some extent in

8    almost every business bankruptcy, and individual business debtors who have enjoyed

9    trade credit are certainly not, with respect to their unpaid suppliers, all "fiduciaries"

10   within the meaning of 11 U.S.C. § 523(a)(4).  This conclusion must be even more

11   obvious with respect to GC who cannot even establish that debtor ever saw any such

12   proposed terms as part of the subject transactions.

13

14        It is also rather obvious that this case does not involve "larceny" or

15   "embezzlement," as are also separate bases for non-dischargeability under 11 U.S.C.

16   § 523(a)(4).  "Embezzlement" within the meaning of § 523(a)(4) requires three

17   elements: (1) property rightfully in the possession of the nonowner debtor; (2) the

18   nonowners' misappropriation of the proprerty to a use other than that for which it was

19   entrusted; and (3) circumstances indicating fraud.  *In re Littleton*, 942 F.2d 551, 555 (9th

20   Cir. 1991); *Lin v. Ehrle* (*In re Ehrle*), 189 B.R. 771 (9th Cir. BAP 1995); *Gilner v. Licalsi*,

21

---

22   [4] Our case is distinguished from other cases such as where a specific requirement that
23   proceeds of product/collateral be placed into a segregated account and be remitted to
     creditor, gave rise to the requisite "fiduciary" relationship.  *See e.g. In re Eisner*, 35 B.R.
24   86 (Bankr. N.D. Ohio 1983).  *Compare Matter of Wise*, 6 B.R. 867, 871 (Bankr. M.D.
     Fla.)[funds from sale of creditor's product were kept in separate account *but* debtor was
25   allowed to write checks against it so long as he also came up with his regular weekly
     payment owed the creditor.  This was not the requisite "fiduciary" relationship but merely
26   one of consignor/consignee].

No. 05-3374, 2008 WL 552470 at *2 (F.Supp.2d. February 27, 2008).  The second and third elements both are missing.  The question of whether the debtor used the coins for a purpose other than intended is very much an open question, particularly considering the "on memo" nature of the transactions and given the fact that there is no evidence that there was any meeting of minds over the "boilerplate" language as appears on the bottom of NGE's invoices.[5]   Further, even giving the plaintiffs the benefit of the doubt over the "on memo" nature of the transactions, there is no evidence that any circumstances indicating fraud are present.[6]

"Larceny" is defined under federal common law as a taking of another's property with fraudulent intent to deprive him of it permanently.  *State v. Sokol (In re Sokol)*, 170 B.R. 556, 560 (Bankr. S.D.N.Y. 1994); *See Black's Law Dictionary* 896 (8th ed. 2004). There is no persuasive evidence that when ordering coins in these transactions the debtor had any nefarious intent to misappropriate them.  Rather, the Court is convinced that debtor had every honest intention to pay for them, or return them to plaintiffs if he were unable to effect a sale, as he had done previously, but became unable to so do as a victim of Mr. Fox's depredations.


### 2. 11 U.S.C. § 523(a)(6): Willful and Malicious Injury to Property

Plaintiffs proceed alternatively under 11 U.S.C. § 523(a)(6), arguing that debtor willfully and maliciously injured the plaintiffs' property (i.e. the coins sold and delivered

---

[5] Of course, this is even more obvious as to GC since even this language is absent.
[6] The Court is aware that plaintiffs have injected issues of "fraud" into their argument concerning debtor's continued orders for rare coins from plaintiffs to be re-delivered to Mr. Fox at a time when Fox's payment history was already spotty.  But at most this amounted to negligence, not an intentional deceit.  The Court strongly doubts that this in any event amounts to the "fraudulent circumstances" spoken of in the case law.

to debtor, but not paid for).  Plaintiffs argue that the debtor's unauthorized transfer of

possession of the coins to Mr. Fox before paying for them was tantamount to a

conversion and, therefore, resulting damages became non-dischargeable.  However,

this is an over-simplification. The "willful" and "malicious" elements of § 523(a)(6) are

stated in the conjunctive, which means that *both* elements must be proven; therefore,

what may be technical conversion under some state law is not necessarily sufficient

under § 523(a)(6).  *See e.g. Ericson State Bank v. Conner (Matter of Conner)*, 59 B.R.

594, 596 (Bankr. W.D. Mo. 1986).

Plaintiffs cite *Impulsoria del Territorio Sur S.A. v. Cecchini (In re Cecchini)*, 780

F.2d 1440 (9th Cir. 1986).  Decided 23 years ago, *Cecchini* held that for purposes of

§ 523(a)(6), "willful and malicious" means a wrongful act (such as conversion) done

intentionally, which necessarily produces harm and is without just cause or excuse even

absent proof of a specific intent to injure.  *Id*. at 1443  Plaintiffs' problem is that the law

in this area has substantially evolved and *Cecchini* has been implicitly overruled in the

Ninth Circuit. *See In re Tsurukawa*, 287 B.R. 515, 525 n.11 (9th Cir. BAP 2002).

In *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 60, 118 S. Ct. 974 (1998)

the United States Supreme Court clarified the meaning of 11 U.S.C. § 532(a)(6) as

confined to intentional torts.  In contrast to earlier cases, the *Geiger* court made clear

that for § 523(a)(6) to apply the actor must intend the consequences of the act, not

simply the act itself, and held definitively that "debts arising from recklessly or

negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Geiger*, 523

U.S. at 60.  This ruling clarified that the mental state of the debtor was critical,

overturning authorities such as *Cecchini*.  After *Geiger*, the Ninth Circuit decided

*Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202 (9th Cir. 2001), *cert denied*, 533 U.S.

930, 121 S. Ct. 2552 (2001).  In *Jercich* the court held that § 523(a)(6)'s willful injury

requirement was met "when it is shown either that the debtor had a subjective motive to

inflict the injury *or* that the debtor believed that injury was substantially certain to occur

as a result of his conduct." *Id*. at 1208 (emphasis added).  *Jercich* also clarified that a

"malicious" injury involves "(1) a wrongful act, (2) done intentionally, (3) which

necessarily causes injury, and (4) is done without just cause or excuse." *Id*. at 1209

    The most recent Ninth Circuit authority to discuss the "willful and malicious"

standard for purposes of 11 U.S.C. § 523(a)(6) is *Carrillo v. Su (In re Su)*, 290 F.3d

1140 ( 9th Cir. 2002).  In *Su*, the debtor drove a van at an unlawfully high rate of speed

through a San Francisco intersection nearly five seconds after the light had turned red.

The debtor crashed into a car that was lawfully in the intersection and careened into

Carrillo, severely injuring her. The jury found that the debtor's conduct "…was wanton,

willful and malicious and such acts were intentionally done with reckless disregard of

the consequences necessarily producing permanent injury and harm to plaintiff, without

just cause or excuse." *Id*. at 1141.   A judgment was awarded to Ms. Carrillo for

economic and non-economic damages and a Chapter 7 bankruptcy of the debtor

ensued.  The bankruptcy court held that the debt was non-dischargeable relying on

*Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998) which had

held that acts were "willful and malicious" when the debtor possesses "either an

objective substantial certainty of harm or a subjective motive to cause harm."  The

bankruptcy court held that when Su drove through the crowded intersection there was

by an "objective standard a substantial certainty" of harm. *Su*, 290 F.3d at 1142.  After

the bankruptcy court's decision in *Su*, the *Jercich* case was decided, which suggested

that the substantial certainty of harm had to be judged on a *subjective* basis, i.e. *what*

1   *did the debtor believe.*  On this basis the BAP in *Su* reversed, holding that the

2   bankruptcy court's objective standard was inconsistent with *Jercich*.

3        On appeal, the Ninth Circuit in *Su* provided further guidance, framing the issue

4   thusly: "The question  presented on appeal is whether a finding of 'willful and malicious

5   injury' must be based on the debtor's subjective knowledge or intent or whether such a

6   finding can be predicated upon an objective evaluation of the debtor's conduct."  The

7   Ninth Circuit resolved the question by holding: "We hold that § 523(a)(6)'s willful injury

8   requirement is met only when the debtor has a subjective motive to inflict injury *or when*

9   *the debtor believes that injury is substantially certain to result from his own conduct." Id.*

10   at 1142 (emphasis added).  "The subjective standard precludes application of

11   

12   § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that

13   harm to the creditor was substantially certain." *Id.* at 1146.

14        Applying the *Su* standard to our case, plaintiffs would have to have proven that

15   the debtor either intended to injure plaintiffs by giving over possession of the coins to

16   Fox, or that debtor must have understood that damage was substantially certain to have

17   occurred.  *Su,* 290 F.3d at 1146, n. 6.  There is not the slightest suggestion in the

18   evidence that debtor intended to injure plaintiffs.  On the contrary, the evidence

19   suggests that the parties had a long-term and mutually profitable arrangement up until

20   that point.  Debtor would have had every incentive to see that things turned out well and

21   that plaintiffs were made whole so as to avoid the considerable trouble and

22   embarrassment that actually resulted.  That he was unable to do so cannot be said to

23   have been the product of any design on his part.  Nor can it be said that the actual

24   result was necessarily a certain one.  Apparently, Fox had from time to time made good

25   on his promises and had returned several high-priced items in the few months

26   

immediately preceding the transactions at issue. Therefore, debtor was at least reasonable, albeit somewhat naïve, in believing that the last round of transactions involving the subject coins would have a favorable outcome. *See Becas,* 2007 WL 1592070 at *3-4. For similar reasons the debtor's acts cannot be construed as being "malicious" since, although it might be argued that the transfer of the coins to Fox before they were paid for could be a "wrongful act," it cannot be said that this would necessarily have caused injury; nor can it be said that it was done without just cause or excuse. *Su,* 290 F.3d at 1146-47; *Jercich,* 238 F.3d at 1209; *Becas,* 2007 WL 1592070 at *3-4.

Plaintiffs also cite *In re Manser*, 99 B.R. 434, 435 (9th Cir. BAP 1986) for the proposition that debt arising from a conversion may be non-dischargeable under 11 U.S.C. § 523(a)(6). Beyond a superficial similarity on the facts, *Manser* is entirely inapposite. First, *Manser* relies on *Cecchini* and was decided before *Geiger, Su* or *Jercich.* Therefore, it cannot be regarded as any current authority on the willful and malicious elements of § 523(a)(6). Second, on closer analysis, it must be seen that *Manser* is a fundamentally different case. In *Manser*, the debtor operated a craft retail store. The debtor signed consignment agreements with artists that required the debtor to remit to them proceeds of their merchandise after deduction of sales tax and an agreed percentage as a fee to the debtor. When financial difficulty arose the debtor instead used the proceeds for his own use and benefit. Under those facts, the BAP held that the debtor had wrongfully and intentionally converted the monies and the resulting debt was accordingly non-dischargeable. *Id*. at 436.

But that is not our case. There are no similar agreements defining the parties' relationship as in *Manser*. Even if the "boilerplate" were included as sale terms, a

1  dubious proposition, as discussed above, there is no specific provision that proceeds

2  must be segregated and remitted in kind as in *Manser*.  Further, unlike *Manser,* there

3  were no proceeds at all in this case.  Had debtor actually received any proceeds from

4  Mr. Fox for any of the coins in question, it might be arguable whether he should have

5  had a parallel duty to remit them to plaintiffs and not to use the proceeds for other

6  purposes as in *Manser*.  But unlike *Manser,* debtor never had this opportunity as he

7  was left without either coins or money by Mr. Fox's devices.  In sum, the Court is not

8  persuaded that *Manser* has any applicability at all to our case.

9

10

### 3.  11 U.S.C. § 523(a)(2)(A): Actual Fraud

11

12  A theory of actual fraud based on 11 U.S.C. § 523(a)(2)(A) does not appear in

13  the complaint.  Nevertheless, some argument was offered in plaintiffs' closing that fraud

14  was present in this case which might serve as a basis for a judgment of non-

15  dischargeability.  It was left unclear from the context whether the "fraud" spoken of by

16  plaintiffs was that referred to in § 523(a)(2)(A) or as referenced in § 523(a)(4) as part of

17  the "fraud or defalcation while acting in a fiduciary capacity."  If the latter, it is unavailing

18  inasmuch as the Court finds that there was no "fiduciary capacity."  But even if the

19  former source is the basis for the reference, it need not detain us very long.

20  Plaintiff argues that debtor knew as of about June 2006 when he switched to

21  direct deposit for remittances from Fox, that Fox was untrustworthy based on a few

22  bounced checks and slow payment record, yet debtor continued to order coins from

23  plaintiffs with the intention of forwarding them "on memo" to Fox.  Plaintiffs argue that

24  this was a material fact that should have been disclosed and had it been disclosed,

25  plaintiffs would never have agreed to ship the coins to debtor.  The problem with this

26

theory is that it is not supported in the evidence and relies entirely on hindsight.  Debtor

testified that as of June 2006 he continued to repose confidence in Fox, and apparently

believed (however naively in retrospect) that the relatively few mishaps were adequately

explained.  There is at least some evidence, such as Fox's return of at least five

expensive coins that had been outstanding "on memo" for an extended period after this

date, which support the reasonableness of this belief.  Plaintiffs bear the burden of

proving that the debtor was aware of circumstances so material at the time of incurring

the credit to plaintiffs which would have, in the absence of disclosure, rendered the

transaction fraudulent.  *P & S X-Ray Co., Inc. v. Dawes (In re Dawes)*, 189 B.R. 714

(Bankr. N.D. Ill. 1995).  Deliberate nondisclosure may be just as culpable as intentional

misrepresentation.  *Wheeling Wholesale Grocery Co. v. Piccolomini (In re Piccolomini)*,

87 B.R. 385 (Bankr. W.D. Pa. 1988); *SunTrust Bank v. Brandon (In re Brandon)*, 297

B.R. 308 (Bankr. S.D. Ga. 2002).  But the facts have to be judged not in hindsight but

as the debtor saw them in September through November 2006, when these

transactions occurred.  There is little or no evidence than any nondisclosure was

material, deliberate or malevolent on debtor's part; instead, at that time debtor still

believed that Fox was a valuable even if tardy customer, and as Mr. Feld's expert

testimony made clear, coin dealers are not expected to reveal their customer's identity

to potential competitors.  Plaintiffs fail their burden of proof.

Plaintiffs also point to the fact that by December 28, 2006, with the exchange of

emails to GC only an hour after debtor's hostile email memo to Fox [Exhibits "10" and

"11"], the debtor clearly knew that Fox could not be trusted, yet he still did not divulge

details to GC.  But by this time the damage had already been done and all coins had

already been shipped both to debtor and on to Fox.  Therefore, there is no causal

1  connection between this event and the damage suffered.

2

3  **C. Conclusion**

4      For the reasons stated, the Court finds that the debts which are the subject of

5  these adversary proceedings are dischargeable in bankruptcy and that plaintiffs have

6  not made a case under any of 11 U.S.C. §§ 523(a)(2)(A), (a)(4) or (a)(6).  Judgment will

7  therefore be entered in favor of the debtor on all claims for relief.  Counsel for debtor

8  will prepare a form of judgment consistent with this Statement of Decision.

9

10

11

12

13  Dated:    FEB 2 3 2009

14                                    Hon Theodor C. Albert
                                   UNITED STATES BANKRUPTCY JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

| In re: | | CHAPTER: |
|---|---|---|
| | Debtor(s). | CASE NUMBER: |

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.

**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.

**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.

**4) Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) _____

_____ was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of ____FEB 2 3 2009_____, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

Michael P. Ring, 1234 Santa Barbara Street, Santa Barbara, CA 93101

Steven L. Stern, Law Offices of Steven L Stern, 2030 Main St Ste 1040, Irvine, CA 92614

☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9021-1.1**